John J. Batterman v. Commissioner.
Batterman v. Commissioner
Docket No. 110244.
United States Tax Court
1943 Tax Ct. Memo LEXIS 435; 1 T.C.M. (CCH) 667; T.C.M. (RIA) 43098; February 25, 1943
*435 S. A. Davies, Esq., and Douglas S. Meaden, C.P.A., 1321 Citizens Bldg., Cleveland, O., for the petitioner. T. F. Callahan, Esq., for the respondent. DISNEY
Memorandum Findings of Fact and Opinion DISNEY, Judge: The Commissioner determined a deficiency in petitioner's income tax for the calendar year 1937, in the amount of $10,810.78. The issues raised by the pleadings are whether the fair market value of certain shares of corporate stock received by the petitioner in the taxable year should be included in his gross income, and if so, whether the respondent's determination as to fair market value is correct. We adopt and incorporate herein by reference the stipulation of facts filed at the hearing. The material parts thereof are included in our findings of fact made also from other evidence. Findings of Fact The petitioner is a resident of Cleveland, Ohio. He filed his 1937 income tax return with the collector for the eighteenth district of Ohio. Shortly prior to November 1931, Dr. Alfred R. L. Dohme, petitioner's brother-in-law, purchased 2,000 shares of "Class B" common stock of The Gabriel Co., an Ohio corporation engaged in the manufacture of automobile shock absorbers. "Class *436 B" common was the only stock having voting rights, and the 2,000 shares purchased by Dr. Dohme constituted all the issued and outstanding shares of that class. Following his purchase, Dr. Dohme caused The Gabriel Co. to enter into a contract dated November 16, 1931, whereby petitioner was employed as its assistant manager for a period of five years at an annual salary of $10,000, plus an agreed percentage of net profits to be computed as therein provided. On January 29, 1933, Dr. Dohme caused the petitioner to be elected to the office of president and general manager of the company. A second contract was entered into on November 5, 1936, under which petitioner was re-employed as general manager of the company for a period of five years at a salary of $12,500 for the first year and $15,000 for each of the remaining four years. Both contracts were carried out by the parties. During the ten-year period, petitioner had no other employment. The Gabriel Co. had sustained operating losses for some years prior to 1936, and in that year was in poor financial condition. Its product had become obsolete, and it was in need of additional capital. There were then issued and outstanding the 2,000 *437 shares of "Class B" common stock held by Dr. Dohme, and 198,000 shares of "Class A" common stock without voting rights. No preferred stock existed, and there were no funded debts. Upon petitioner's recommendation, H. M. Preston & Co., a firm of financial experts, was authorized to make a survey of the company's condition. The survey resulted in a recommendation that the experts be permitted to prepare a plan for reorganization of the capital structure of The Gabriel Co., to provide, among other things, for an increase of "Class A" stock to 300,000 shares, the surrender by Dr. Dohme of his "Class B" shares in exchange for 40,000 shares of the additional issue of "Class A", and the sale of the remaining "Class A" shares. In January of 1936, the petitioner and R. Hoskin Damon, of H. M. Preston & Co., discussed the proposal with Dr. Dohme for the first time at the latter's home in Mountain Lake, Florida. Damon told Dr. Dohme that it had been concluded that of the 40,000 shares of "Class A" stock to be issued to him in exchange for his "Class B," he would be entitled to retain 10,000 for himself; that out of the remaining 30,000 there would be paid the expenses of executing the plan, and *438 the charges of H. M. Preston & Co. for its services; and that the charge to be made by the experts would not exceed 20,000 shares. Dr. Dohme was at first reluctant to agree to accept only 10,000 shares of such a large issue, but, after discussing the matter with his wife, concluded that his present holdings were of little value, and that under the plan the 10,000 new shares might come to have some value in the future. Accordingly, he consented to the proposal, and gave to the petitioner his proxy to vote the "Class B" shares in its favor. At the time of the discussion, it was agreed that provision would also be made for a distribution to the petitioner and other key men in the company out of the 40,000 shares to be issued to Dr. Dohme. On March 31, 1936, Dr. Dohme, in exchange for voting trust certificates issued to him, deposited his stock with The Cleveland Trust Co. under a voting trust agreement designating H. M. Preston, R. Hoskin Damon and the petitioner as voting trustees. By the agreement the trustees were empowered, among other things, to vote the deposited shares in favor of any proposed increase or decrease of authorized capital stock of The Gabriel Co.; any proposal for *439 the exchange of "Class B" shares for other shares to be issued under any proposed plan of capital adjustment; and any amendment of the company's certificate of incorporation for the modification of rights and preferences of any class of stock then or thereafter outstanding. On April 4, The Gabriel Co. formally proposed to the voting trustees that 40,000 shares of new "Class A" stock be issued to them in exchange for and in consideration of the surrender and cancellation of the 2,000 shares of "Class B" held by them, the voting rights of the stock of the corporation thereafter to be vested in all the common stock. The trustees accepted the proposal, subject to the consent of the holders of the then outstanding shares of "Class A." At a stockholders' meeting held April 9, the petitioner, under the proxy from Dr. Dohme, voted the "Class B" shares in favor of a resolution authorizing H. M. Preston & Co. to prepare the plan for reorganization of the company's capital structure. Such a plan was prepared and submitted. In so far as here material, it conformed with that originally outlined and discussed by Dr. Dohme, Damon and the petitioner. It met with Dr. Dohme's approval, and was adopted *440 by the shareholders at a meeting held May 18, 1936. The trustees' acceptance of The Gabriel Co.'s proposal of April 4 thereupon became effective. On November 29, following a certificate for 40,000 shares was issued to the trustees; it was exchanged on December 21, for a certificate for 30,000 shares and another for 10,000 shares. The latter was distributed to Dr. Dohme on December 24. At the same time he directed the trustees to distribute the 30,000 shares as follows: to H. M. Preston & Co. and its nominees, an aggregate of 18,320, and the balance, in such amounts as the trustees should agree, among the petitioner, E. L. Beecher, research engineer and superintendent of production of The Gabriel Co., and L. W. Klein, its secretary. H. M. Preston & Co. and its nominees actually received an aggregate of 18,000 shares. The petitioner proposed to distribute 9,000 of the remaining 12,000 to himself, and 1,500 each to Beecher and Klein. Of the petitioner's allotment of 9,000 shares, 240 shares were subsequently optioned at $4 per share to a disgruntled stockholder to appease him; the option was exercised, the stockholder received the shares, and the petitioner received $960 in cash. Forty *441 shares of each of the allotments to Beecher and Klein were similarly optioned and sold. On February 1, 1937, the voting trustees formally authorized the depositary to issue the 18,000 shares to H. M. Preston & Co., 8,760 shares to petitioner, and 1,460 shares each to Klein and Beecher. Actual distribution was made accordingly on February 23, 1937. Petitioner's shares were issued to himself and his wife jointly. Sales of 24,342 shares of the additional issue of stock were made for the purpose of affording new capital, so that immediately prior to the distribution of February 23 (and after Dr. Dohme had received his 10,000 shares) there were a total of 232,342 shares outstanding. Immediately thereafter, after the petitioner, Beecher, Klein and H. M. Preston & Co. received a total of 30,000 shares, the number was 262,342. The petitioner's personal associations with Dr. Dohme were unusually pleasant. The latter considered the petitioner, Beecher and Klein to be key men of The Gabriel Co. It was his wish that all of them be given a financial interest in the corporation, through the distribution among them of whatever number of shares remained out of his block of 40,000. Through his experience *442 with another corporation in which he was interested, he had come to believe that the ownership by its executives of a financial interest would act as an inducement to them to take more than a normal interest in the affairs of The Gabriel Co. He wanted the petitioner to remain in its employ, and felt that the ownership of stock would be an incentive to him and to the other two men to continue to devote their best efforts to the company. It was his hope that the petitioner's continued association with it might enable the company to get on its feet, and eventually give some value to his own holdings. The foregoing were all factors motivating his decision that stock should be given to the petitioner, and to Beecher and Klein. He intended that the matter of actual apportionment of the shares among the three men be left to petitioner's judgment. It was not until after the distribution among petitioner, Beecher and Klein had actually been made that Dr. Dohme knew how many shares had been distributed to each. Although his security holdings were large, and although he was a moderately wealthy man, Dr. Dohme had never made gifts of any securities to the petitioner, other than the one here *443 under consideration. He filed no gift tax return for any year from 1932 to 1938. Petitioner never received any bonus or additional compensation from The Gabriel Co., exclusive of the stock here in question. During 1938 and 1939 he and his wife made sales of Gabriel Co. stock, and in each instance reported the whole net sales price as capital gain on their joint income tax returns. On each return, in connection with the report of the gains, the following note appeared, under the heading "Cost": "No Cost - received for services rendered." Mrs. Batterman had never been employed by Dr. Dohme nor by The Gabriel Co. Neither was indebted to her, nor to the petitioner. The Gabriel Co. sustained operating losses as follows: Loss
1935
$41,976.00
1936
77,368.00
1937
18,359.00
1938
55,101.00
1939
27,732.00
During the years 1935 to 1939 the number of its shares dealt in on the New York Stock Exchange and the high and low prices for the respective years were as follows: Shares sold
High
Low
1935
Not shown
5 3/8
7/8
1936
Not shown
7 3/8
3 3/4
1937
141,420
7 1/2
1 1/8
1938
60,300
3 7/8
1 1/4
1939
53,600
3 1/4
1 1/2 The stock had a book value *444 in December 1936 of $2.61 per share. During the week in which February 23, 1937, fell, sales of 2,800 shares were made on the New York Stock Exchange. On February 23, 1937, sales were made at 5 3/8. During 1936, petitioner, Klein, Beecher, and H. M. Preston & Co. orally entered into what the petitioner termed a "gentlemen's agreement" that in any one year each would try not to sell more than one-fifth of the shares he would receive. Petitioner did so because he felt that heavy sales would depress market value; he was willing to make the arrangement in the hope that the interests of all might be maintained. In connection with the recapitalization, Shields & Co., a brokerage firm of New York, was granted an option to purchase 20,000 shares of the newly issued stock, at $4 a share. The option was not exercised. The 8,760 shares of The Gabriel Co. stock issued to petitioner had a fair market value on February 23, 1937, of $5.375 per share, amounting in the aggregate to $47,085. On his return for the taxable year, petitioner reported $5,531.38, representing the proceeds of the sale of 1,040 shares of Gabriel Co. stock, as capital gain. Respondent determined that the stock had a fair *445 market value of $5.375 per share when issued to petitioner, and an aggregate value of $48,375 for 9,000 shares, which amount he held to be taxable income. He computed the shares sold during the taxable year as having a basis of $5,590, and eliminated the gain reported by the petitioner. Other adjustments to net income are not in issue. Opinion The principal issue here involved is whether the fair market value on February 23, 1937, of 9,000 shares of stock of The Gabriel Co. is taxable to the petitioner under section 22 (a) of the Revenue Act of 1936. [1]
Petitioner contends that he received *446 the stock as a gift, and hence that it is exempt from taxation under section 22 (b) (3) of the statute. [2]
A preliminary question is presented in connection with this issue. Respondent added to petitioner's reported net income the value, as determined by him, of 9,000 shares of Gabriel stock. It is stipulated that only 8,760 shares were actually issued to the petitioner; the evidence discloses that he received also the proceeds of the sale of an additional 240 shares at $4 per share. The petitioner having failed to show otherwise, we assumed that the proceeds of the 240 shares sold were received by him in 1937. Whether or not the transfer of the stock constituted a gift is not to be determined from the fact that the transferor, Dr. Dohme, may have called it a gift, but rather from an examination of all the circumstances surrounding the transaction. *447 . Several facts strongly indicate that motives other than, or in addition to, a desire merely to confer a gratuitous benefit upon petitioner induced Dr. Dohme to consent to the issuance of the stock to him. The strongest indication, and one which in itself perhaps would justify the conclusion that there was no gift here, is the fact that the distribution to the petitioner and others was in accordance with the plan for readjustment of the capital structure of The Gabriel Co., of which Dr. Dohme was ignorant until Damon and the petitioner discussed it with him early in 1936. He testified that he was then unwilling to agree to accept only 10,000 shares for himself, and that he decided to do so because of the hope that his holdings might come to have some value if the plan were consummated. The idea of distributing some of the new stock to the petitioner neither originated with Dr. Dohme nor met with his approval until, after consideration, he concluded that the execution of the plan as a whole might be of benefit to himself. Such considerations are not those of one about to make a gift. That the petitioner was a brother-in-law *448 of Dr. Dohme is of very slight weight on the question of gift, for Klein and Beecher also received stock, and they had no family connection with Dr. Dohme. There were other factors motivating Dr. Dohme's decision. He felt that the petitioner, Beecher and Klein, were key men in The Gabriel Co., and wanted them to continue in their association with it. According to Dr. Dohme's testimony, the petitioner was to make such use of the stock "as in his judgment would serve the best purposes among the key men of the company * * *." He felt that a financial interest in its affairs would encourage them to stay, and to take more than a normal interest in the affairs of the corporation. Those are motives associated with personal gain, rather than with beneficence. No extended review of the evidence is here necessary. We are convinced that Dr. Dohme's principal thought in consenting to the plan for readjustment of capital structure of the corporation was the hope of the ultimate betterment of his own financial position. That the petitioner, too, would personally benefit, although gratifying to him, was an incidental and secondary consideration. We think that Dr. Dohme's interest in the reorganized *449 company and the retention of the key men therein clearly distinguish this case from , principally relied on by the petitioner. We hold that there was no gift to the petitioner in 1937, either of the 8,760 shares of stock or of the proceeds of the sale of the 240 shares. The petitioner argues that in every case in which a bonus payment has been held taxable to the recipient a debt or legal obligation existed which was liquidated by the payment. We disagree. As was stated by the Circuit Court of Appeals for the Sixth Circuit in : * * * It is settled law that a payment may be compensation for services although made voluntarily and without legal obligation. . The petitioner contends, further, that since neither he nor his wife was an employee of Dr. Dohme there is no ground on which the stock may be held additional compensation and its value included in gross income. The contention presupposes that unless the stock was compensation, paid *450 and received as such, its value is not taxable to the petitioner. A sufficient answer is that the respondent has determined that the value of the stock "constituted taxable income under the provisions of Section 22 (a) of the Revenue Act of 1936," not merely that it was taxable as compensation for personal service. The statutory definition of gross income includes, among other things, "gains or profits and income derived from any source whatever." It is not sufficient to overcome the presumption of the correctness of the respondent's determination, for petitioner merely to show that the value of the stock did not constitute income of one class of the several defined in the statute. But we need not base our decision on that narrow ground. We know of nothing to prevent another than the employer from paying compensation for the employee's services, where, as here, he has a real interest in the services to be performed. Whether a limited and temporary employer-employee relationship sprang up between Dr. Dohme and the petitioner, or whether the transaction was, in effect, a contribution by the former to the capital of the corporation, to enable it to pay the additional compensation to petitioner, *451 need not be decided. In , a holding company holding all of the stock of a railroad company sold all its holdings to another railroad company, receiving stocks and bonds of the purchaser in payment of the sale price. Pursuant to authority from its stockholders, the holding company made bonus payments of additional compensation to plaintiff and others, all employees of the old railroad company. Plaintiff paid income tax on the amount of his bonus, filed a claim for refund, and brought suit against the collector. With regard to his contention that he was not an employee of the holding company, and that the railroad company alone could make payment of additional compensation, the Circuit Court (C.C.A., 5th Cir.) said, in part: * * * The objection would have force where the third person had no interest in the employment and no cause to feel obligated to compensate the service. But in this case although the stockholders authorized the payment, it was made out of funds really belonging to the Holding Company as the proceeds of the sale of its assets, and the Holding Company was the sole owner of the Railroad Company. * * * *452 In determining the incidence of taxation, corporate organization of taxpayers is not ordinarily to be disregarded. * * * But in a case like this where neither corporation nor stockholder is the taxpayer, and motive and intent is the question, the substance of the matter should be looked to. * * * In , the Court of Claims made a similar holding in a case involving a bonus payment to another employee of the same railroad company. It said: * * * That the money received by the plaintiff was not paid directly by the railroad company but was paid by the stockholder's committee of the holding company does not change the essential character of the transaction, and make a gift out of what was intended to be, and in fact was, additional compensation for services rendered. In , upon which petitioner relies, the Supreme Court, under the facts there involved, held a payment of money by a holding company to a former employee of an operating company to be a gift rather than additional compensation. The case turned on the Court's conviction that the payment *453 was intended as a gift, and was an act of "spontaneous generosity." See (C.C.A., 9th Cir.). There was "entirely lacking the constraining force of any moral or legal duty as well as the incentive of anticipated benefit of any kind beyond the satisfaction which flows from a generous act." The majority opinion expressly points out that it was not concerned with a payment made by the employing company, "or by stockholders of that company still interested in its success and of the maintenance of the good will and loyalty of its employees." Cf. . We conclude that the 8,760 shares of stock, and the proceeds of the sale of 240 additional shares, were received by the petitioner as additional compensation. Under article 22 (a)-3 of Regulations 94, the fair market value of the stock is to be included in petitioner's income. Turning, therefore, to the question of value, we find that respondent based his determination on the price at which sales were made on the New York Stock Exchange on the day in question, and that in the week within which that *454 day fell sales of 2,800 shares were reported by the Exchange. Petitioner's contention that that valuation is excessive looks for support to the following circumstances: The book value in December 1936 was only $2.61 per share; his shares were subject to an agreement restricting their sale; a brokerage firm failed to exercise an option to purchase 20,000 shares at $4 per share; he argues also that the fact that the company continued to operate at a loss during the ensuing years, and that after 1937 its stock did not sell on the New York Stock Exchange at a higher price than 3 7/8, supports his contention that the 1937 sales were at fictitious values. Though book value is not without effect as indication of actual value, we think that it alone can not be taken to establish a fair market value other than that determined by the respondent, in the face of the presumption of correctness favoring his determination. As the Board said in , "We are here concerned not with book value but with market value. The two are not synonymous." The only evidence with regard to the agreement restricting sale of petitioner's shares is *455 found in his own testimony. He referred to it as a "gentlemen's agreement," and said that he and the other distributees agreed to "try in case of necessity not to sell more than about one-fifth part of the total amount that each of us had in any one year." Obviously, such evidence will not justify a holding that a binding contract was made. In the light of this conclusion, we do not consider as effective here, the authorities upon which the petitioner relies, dealing with the question of the effect on fair market value of a binding restriction against sales. Cf. ; reversed on other grounds, . The failure of the brokerage firm to exercise its option may have resulted from one or more of any number of reasons. In the absence of a particular showing we may not interpret its action as of weight with respect to the question of value. Nor does the fact that subsequent operations of the corporation continued at a loss control the question. That circumstance, too, may be indicative of real or intrinsic value, but as the Board said in : *456 * * * It may be irrational for buyers on the stock market to pay more for a stock than the per share value of the underlying corporate assets, but we are concerned only with what that stock will fetch on such a market even though it be irrational. . See also Isaac W. Frank Trust of 1927, . Considering all the circumstances, it is our opinion that the evidence fails to establish error in the respondent's determination of value, and we therefore find no error therein, and find the stock to have had a value of $5.375 per share, on February 23, 1937. The petition also alleges that certain over-assessments determined for the years 1938 and 1939 should be increased. No deficiencies having been determined for those years, we are without jurisdiction to redetermine the alleged overpayments; petitioner does not now argue the point. Decision will be entered under Rule 50. Footnotes
1. SEC. 22. GROSS INCOME. (a) General Definition. - "Gross income" includes gains, profits, and income derived from salaries, wages, or compensation for personal service, of whatever kind and in whatever form paid, or from professions. vocations, trades, businesses, commerce, or sales, or dealings in property, whether real or personal, growing out of the ownership or use of or interest in such property; also from interest, rent, dividends, securities, or the transaction of any business carried on for gain or profit, or gains or profits and income derived from any source whatever. * * *↩
2. (b) Exclusions From Gross Income. - The following items shall not be included in gross income and shall be exempt from taxation under this title: * * * * *
(3) Gifts, Bequests, and Devises. - The value of property acquired by gift, bequest, devise, or inheritance (but the income from such property shall be included in gross income).↩